No. 70,692

STATE OF KANSAS, *Appellee*, v. PRESTON COLLINS, *Appellant*.
(893 P.2d 217)

Opinion filed April 21, 1995.

*Julie A. Gorenc*, assistant appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with her on the briefs for appellant.

*Christina M. Dunn*, assistant district attorney, argued the cause, and *Paul J. Morrison*, district attorney, and *Robert T. Stephan*, attorney general, were with her on the brief for appellant.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals his conviction of attempted first-degree murder, a class B felony in violation of K.S.A. 1991 Supp. 21-3301 and K.S.A. 1991 Supp. 21-3401, and sentence of 15 years to life imprisonment. Defendant contends the trial court erred in (1) denying his request to represent himself and (2) failing to instruct the jury on attempted involuntary manslaughter. This court has jurisdiction pursuant to K.S.A. 1994 Supp. 22-3601(b)(1).

On February 6, 1992, Preston L. Collins shot his ex-girlfriend, Ann E. Whedon, with a shotgun in the parking lot of a Silo appliance store in Overland Park, Kansas. Prior to the shooting Whedon and Collins had lived together for 15 years. She had recently left him because of his aggressive behavior and verbal abuse.

After Whedon had left Collins, he began stalking her. Approximately two weeks before the shooting, Collins forced her to return home at gunpoint. The next day, Whedon again left and obtained a Missouri district court protective order directing Collins to stay away from her. Whedon informed the police that she was afraid of Collins because he had threatened her, he had called her at work frequently, and she believed he was going to do something to her. Because of Collins' threats, Whedon carried a .22 caliber pistol for her protection.

On the morning of February 6, 1992, Whedon drove to work for a company sales meeting and parked her truck in the Silo parking lot. After the sales meeting, Whedon returned to her truck and discovered Collins hiding in the back seat. Whedon observed the tip of a shotgun protruding from beneath Collins' raincoat, ran into the parking lot behind another vehicle, and pulled out her pistol. Collins got out of the back seat of the truck, pulled out a .12 gauge shotgun from underneath his long coat, and came after her.

Whedon pointed the pistol at Collins. Collins brandished his shotgun and told Whedon to throw down her gun. Whedon threw down her pistol. Whedon begged Collins not to shoot her and agreed to go home with him or do whatever he asked.

Wielding his shotgun in one hand, Collins used his free hand to grab Whedon by the arm. In struggling to get away from Collins, Whedon either fell or was pushed to the ground. Collins fired three shots at point blank range. Collins' first shot missed Whedon and struck a nearby car. After the first shot, witnesses heard Whedon pleading for her life. Collins pointed the gun at Whedon's face and fired his second shot. This shot dismembered Whedon's right hand and left thumb and shattered the front window of a nearby store. Collins then stood directly over Whedon and aimed the shotgun at her. Whedon curled into a fetal position, pulling her legs up over her chest in an attempt to block the shot. Collins fired a third time, blasting into the back of Whedon's left leg. Collins then ran from the area and eventually turned himself in to the police that evening. Collins was charged with attempted first-degree murder.

Collins' defense consisted of his testimony and that of his daughter. Collins testified that he never had pulled a gun on Whedon or been physically or verbally abusive towards her. Collins testified that Whedon had previously threatened to kill him. Following Whedon's threat on his life, Collins stated that he had removed all guns from their house and had put the shotgun and ammunition under the back seat of the truck.

Collins testified that he had gone to the Silo store on the day of the shooting to retrieve his truck. Collins stated that the truck was registered in Whedon's name so the purchase would go through on her credit. He stated that he intended to take the truck and call Whedon later. Once he got into the truck he discovered that Whedon had changed the ignition lock.

According to Collins, when he noticed Silo employees leaving the store, he climbed into the back seat to retrieve his shotgun. When Whedon opened the door of the truck and saw him, she pulled a pistol. Collins picked up the shotgun, stumbled out of the truck, and observed Whedon raising her pistol toward him. Collins ordered Whedon to drop the gun. When she did not do so, he fired at the gun at her right hand. Collins stated that the impact knocked Whedon to the ground, and the gun fell into her stomach. He said Whedon reached for the gun with her left hand.

Collins claimed he fired the other shots in an attempt to scare Whedon, but not to hurt her.

Collins' 13-year-old daughter testified that Whedon and Collins threatened each other and that Whedon had threatened to kill Collins several times. The daughter stated that she had witnessed Collins pull a gun on Whedon in an attempt to get her to come back home. The daughter testified that Collins had previously carried his shotgun in the truck when he took it to show a friend.

The trial court instructed the jury on attempted first-degree murder and the lesser included offenses of attempted second-degree murder, attempted voluntary manslaughter, and aggravated battery. The defendant's request for an instruction on attempted involuntary manslaughter was denied. The jury found Collins guilty of attempted first-degree murder. Collins' motions for new trial and for judgment of acquittal were denied, and he was sentenced to a term of 15 years to life. Collins' motion to modify his sentence was denied. Collins appeals.

### Right to Self-Representation

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining Witnesses in his favor, and to have the Assistance of Counsel for his defence." § 10 of the Kansas Constitution Bill of Rights states, in relevant part, that "[i]n all prosecutions, the accused shall be allowed to appear and defend in person, or by counsel."

In *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975), the United States Supreme Court held that the Sixth Amendment, as made applicable to the states by the Fourteenth Amendment, guarantees that a defendant in a state criminal trial has an independent constitutional right to self-representation. Following *Faretta*, this court recognized this constitutional right to self-representation in *State v. Ames*, 222 Kan. 88, Syl. ¶ 7, 563 P.2d 1034 (1977) (defendant has constitutional right to self-representation and may defend himself without coun-

sel when he voluntarily and intelligently elects to do so). See also *State v. Cunningham*, 222 Kan. 704, 707, 567 P.2d 879 (1977) (where the record fully established that the defendant's choice of self-representation was knowingly and intelligently made, the trial court would have committed reversible error in depriving the defendant of his constitutional right to self-representation).

On February 11, 1992, Michael Bartee, the assistant public defender, was appointed to represent Collins. Bartee represented Collins at the April 22, 1992, preliminary examination. On August 6, 1992, the district judge granted Collins' motion to dismiss his court-appointed attorney and Bartee's motion to withdraw for good cause shown. Collins assured the judge he would retain his own counsel.

The district judge continued the case for several docket calls because Collins assured the judge that "his people" would hire an attorney. On October 30, 1992, the court appointed Kevin Harris to represent Collins. Soon thereafter, Harris filed a motion to withdraw as counsel for the defendant. The judge reluctantly excused Harris after Collins again assured the judge he would hire an attorney.

On December 17, 1992, the judge appointed Charles Droege to represent Collins. Trial commenced on March 29, 1993, and lasted until April 1, 1993. On the second day of trial, midway through the State's presentation of its case, defense counsel informed the judge that Collins was not satisfied with his representation and wanted him to withdraw. Out of the presence of the jury, Collins stated that his defense counsel had failed to address certain discrepancies in the testimony of Whedon, that he was afraid counsel would not call his daughter to testify, and that his relatives, who were in the courtroom, thought defense counsel was not properly representing him.

The trial judge reviewed the history of Collins' case, noting the deterioration of Collins' relationship with his two previous attorneys and Collins' repeated failure to hire counsel of his own choosing even though he had assured the court he would do so. The judge further noted the considerable experience of Charles Droege, Collins' trial counsel, that Droege was quite competent

to defend Collins, and that Collins had not expressed dissatisfaction until the second day of trial. The judge denied Collins' motion and ordered that the trial proceed. Defense counsel then informed the court that Collins wished to represent himself. The trial judge denied Collins' request.

The State resumed presentation of its evidence, but the trial was interrupted again when defense counsel advised the court that Collins had a heart condition and was experiencing chest pains. Collins was transported to the hospital for evaluation. Over Collins' objection, trial resumed the following day after it was determined that Collins had not suffered a heart attack. After the State rested its case, defense counsel moved for a mistrial, citing Collins' mental incapacity. The court denied the motion for mistrial. Defense counsel then renewed his motion to withdraw. The judge denied defense counsel's request.

Collins contends that the court's insistence that he be represented by counsel violated his constitutional right to represent himself in the criminal action and was an improper exercise of judicial discretion. The State points out that Collins did not clearly and unequivocally assert his right to self-representation until into the second day of jury trial and argues that a balancing of the factors enunciated in *State v. Cromwell*, 253 Kan. 495, 505, 856 P.2d 1299 (1993), demonstrates the trial court did not abuse its discretion in denying Collins' request to proceed pro se.

Collins asserts that the facts in his case parallel *State v. Lowe*, 18 Kan. App. 2d 72, 847 P.2d 1334 (1993). *Lowe*, however, involved a pretrial request to proceed pro se. The *Lowe* court, following *Faretta v. California*, noted that a criminal defendant who prior to trial clearly and unequivocally expresses a wish to proceed pro se has the right to represent himself or herself after a knowing and intelligent waiver of the right to counsel. A knowing and intelligent waiver requires that the defendant be informed of the dangers and disadvantages of self-representation so that the record will establish the defendant knew what he or she was doing and such choice was made "with eyes open." 18 Kan. App. 2d at 74.

The *Lowe* court pointed out that in order to assert the right to self-representation, a criminal defendant must clearly and un-

equivocally express a wish to proceed pro se prior to trial. A defendant's request to be relieved of counsel in the form of a general statement of dissatisfaction with an attorney does not amount to an invocation of the right to represent oneself. 18 Kan. App. 2d 72, Syl. ¶¶ 1, 2. The *Lowe* court reversed the defendant's convictions after finding he was not afforded the opportunity to make the choice between proceeding with counsel or proceeding pro se. *Lowe* sets the standard when there is a clear and unequivocal request by the accused to represent himself or herself prior to trial.

More recently, in *State v. Cromwell*, 253 Kan. 495, which is factually similar to this case, the court addressed whether a defendant may assert his right to self-representation after trial has commenced. Cromwell had made known to the judge that he was dissatisfied with his appointed counsel early in the case. He repeatedly expressed distrust of his attorney and had requested that the court appoint substitute counsel. After pretrial motions were argued, the defendant asked to serve as "cocounsel" in his own defense. After expressing concern about the communication problems between defendant and his counsel, the trial court granted a three-week continuance. During that period of time, communication was reestablished between attorney and client. At a subsequent pretrial hearing, defense counsel told the court that defendant had asked if he could cross-examine a witness. The court indicated it preferred that defense counsel conduct the questioning.

At trial, the court denied Cromwell's request to present the opening statement and his request to conduct the cross-examination of the State's witnesses. Midway through the first day of trial, after three State witnesses had testified, defendant asked to represent himself so that he could question the witnesses. Cromwell told the court that the reason he wanted to cross-examine the witnesses was because he did not trust his attorney to ask the witnesses the questions that he wanted asked. The court informed the defendant that if his attorney would not ask questions he thought were important, that might be reason to allow the defendant to ask questions of the witnesses. The trial judge informed

the defendant that complaints as to the form of the questions asked by his attorney were not sufficient reason to allow the defendant to ask the questions. Defense counsel indicated that for strategic reasons she had modified some of the questions defendant had requested. The trial judge denied defendant's request for self-representation. 253 Kan. at 499-504.

On appeal, the *Cromwell* court held that although a defendant has a right to self-representation, that right is unqualified only if it is asserted prior to trial. The *Cromwell* court concluded that if this right is asserted after trial commences, a decision to grant or deny self-representation lies within the sound discretion of the trial court. In deciding whether to grant or deny self-representation to a criminal defendant after trial has commenced, the trial court should balance the alleged prejudice to the defendant with any disruption of the proceedings, inconvenience and delay, and possible confusion of the jury. It noted that the trial judge should also consider the reason for the request and the quality of counsel's representation. 253 Kan. 495, Syl. ¶¶ 4, 5, 6. The *Cromwell* court held that the trial judge, in balancing the relevant factors, did not abuse his discretion in denying defendant's motion for self-representation.

Collins' assertions that the trial court "failed to exercise any discretion whatsoever" and "completely failed to undertake any query" concerning Collins' request to proceed pro se are incorrect. Collins ignores the court's previous lengthy discussion of the history of Collins' case, the considerable experience and quality of Collins' trial counsel, and the court's dissatisfaction with Collins' reasons in considering Collins' request that another attorney be appointed to represent him, which immediately preceded Collins' request for self-representation. In his request to proceed pro se, Collins expressed no additional reasons beyond those previously rejected as insufficient to cause the court to allow Droege to withdraw. Under the circumstances, the trial court was not required to reiterate its reasons for refusing to allow the attorney to withdraw, moments later, when Collins requested to represent himself.

In this case, Collins did not assert his right to self-representation until the second day of trial, midway through the State's

presentation of its case. The parties had conducted voir dire; the State had made its opening argument; and four witnesses, including the victim, had completed their testimony. As in *Cromwell*, granting Collins' request for self-representation could well have been disruptive, caused undue delay, and confused the jury. The trial court did not abuse its discretion in denying Collins' request for self-representation.

### Attempted Involuntary Manslaughter Instruction

Collins requested that the jury be instructed on attempted involuntary manslaughter as a lesser included offense of attempted first-degree murder. The trial judge refused, stating:

"The language of the instruction of involuntary manslaughter is that the defendant killed someone unintentionally. Obviously that is not an appropriate instruction for this case. It is a contradiction in terms as well. So although the defendant seeks that instruction, the Court finds it is inappropriate and will decline to give the same."

Collins acknowledges that Kansas has not recognized the crime of attempted involuntary manslaughter. To support his claim that such a crime exists, Collins points out that the trial judge instructed the jury on self-defense. Collins asserts that the attempted involuntary manslaughter instruction should have been given to allow the jury to consider whether he had a lawful claim of self-defense but had acted in an unlawful or excessive manner. The State responds that, under Kansas law, there is no such offense as attempted involuntary manslaughter.

The statute defining "attempt" at the time of the alleged offense provided:

"An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 1991 Supp. 21-3301(a).

The crime of involuntary manslaughter was defined as:

"Involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally in the wanton commission of an unlawful act not amounting to a felony, or in the commission of a lawful act in an unlawful or wanton manner." K.S.A. 21-3404.

Relying upon this court's statement in *State v. Gregory*, 218 Kan. 180, 186, 542 P.2d 1051 (1975), that the "use of excessive

force could be found to be an 'unlawful manner' of committing the lawful act of self-defense, and thus supply that requisite element of involuntary manslaughter," Collins argues that he was entitled to have the jury instructed as to attempted involuntary manslaughter. In *Gregory*, the defendant was charged with second-degree murder and convicted by a jury of involuntary manslaughter. The defendant claimed he shot the victim in self-defense. At trial, the defendant objected to the instruction on involuntary manslaughter, claiming the evidence would not support it. On appeal, Gregory broadened his argument, claiming that involuntary manslaughter was not a lesser included offense of second-degree murder. 218 Kan. at 182.

After finding that involuntary manslaughter was a lesser degree of the murder pursuant to K.S.A. 21-3107(2)(a), the court addressed whether giving the manslaughter instruction was justified by the evidence. Paraphrasing the manslaughter statute, the court noted that it required (1) an unintentional killing without malice; and (2) that it occur while the defendant was either (a) committing some misdemeanor or (b) performing some lawful, as opposed to criminal, act in a manner which, in turn, was either (i) unlawful, or (ii) wanton. 218 Kan. at 183. In determining whether the jury could have found that the defendant had engaged in a lawful act but had done so in an unlawful manner, the court noted that if the jury found that the defendant was in fact being attacked, it would necessarily find that he was entitled to defend himself, and that in doing so, he was engaged in a "lawful act." Nevertheless, noting that the self-defense statute, K.S.A. 21-3211, limited one's self-defense to "that force which reasonably appears to be necessary for that purpose," the court found that the involuntary manslaughter instruction was necessary in the event the jury found the defendant had used excessive force.218 Kan. at 184-86. The *Gregory* court concluded that sufficient evidence existed to support the involuntary manslaughter instruction.

*Gregory* is distinguishable from this case. Collins cannot use the ruling in *Gregory* that involuntary manslaughter is a lesser included offense of murder in support of his claim that an instruction on attempted involuntary manslaughter must be given under the circumstances of this case.

In a more recent case, *State v. Robinson*, 256 Kan. 133, 883 P.2d 764 (1994), the question was whether attempted felony murder was a crime. The trial court had instructed the jury that it could convict the defendant of attempted first-degree murder if it found the shooting was intentional, deliberate, and premeditated, or felony murder if the shooting occurred during the commission or attempted commission of an aggravated robbery. The jury returned a general verdict of guilty to attempted first-degree murder, providing no indication as to whether it relied on the premeditation or felony-murder theory. 256 Kan. at 135.

The *Robinson* court pointed out that Kansas does not recognize the crime of attempted felony murder and that the application of the felony-murder doctrine depends on the existence of an actual homicide. 256 Kan. at 136. The court noted that K.S.A. 1992 Supp. 21-3301 establishes three essential elements for an attempt: (1) the intent to commit the crime; (2) an overt act toward the perpetration of the crime; and (3) a failure to consummate it. The *Robinson* court noted that in order to convict a defendant of a crime, the State must show the commission of an overt act plus the actual intent to commit that particular crime. See *State v. Garner*, 237 Kan. 227, 238, 699 P.2d 468 (1985). It concluded that one cannot intend to commit an accidental, negligent, or reckless first-degree, premeditated, or felony murder. The *Robinson* court reversed the defendant's attempted first-degree murder conviction and remanded for a new trial.

Collins confuses the issue by arguing that he intentionally acted in self-defense but that he did not intend to use excessive force in defending himself. Collins' argument improperly assigns the object of his attempt as the use of unnecessary force rather than his act of self-defense.

Contrary to Collins' assertion, the attempt statute requires that a person have the specific intent to commit the crime charged. Regardless of whether Collins intentionally acted in self-defense, he could not have intended to commit an unintentional killing, or involuntary manslaughter. Had the jury concluded that Collins was justified in using self-defense but that his use of force exceeded that necessary to defend himself against Whedon's im-

minent use of unlawful force, it would have found Collins guilty of aggravated battery, as instructed.

The language of the attempt statute, K.S.A. 1991 Supp. 21-3301(a), requires that a person possess the specific intent to commit the crime. Therefore, to establish the crime of attempted involuntary manslaughter the person would be required to specifically intend to commit an unintentional crime. This is a logical impossibility. Although it is possible for an actor to use excessive force in self-defense, the actor cannot unintentionally act in self-defense. We conclude that Kansas does not recognize the crime of attempted involuntary manslaughter.

Affirmed.