IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,508


STATE OF KANSAS,
*Appellee*,

v.

CHRISTOPHER D. KEMMERLY,
*Appellant*.


SYLLABUS BY THE COURT


1.

The right to self-representation, like the right to assistance of counsel, arises from the Sixth Amendment. Because these rights are in tension, a defendant who wishes to self-represent must waive their right to counsel knowingly and intelligently.


2.

To ensure a defendant's right to self-represent is exercised knowingly and intelligently, district courts must satisfy three things on the record before accepting a defendant's waiver of his right to counsel. First, the defendant must be advised of their right to counsel and to appointed counsel if indigent. Second, the defendant must possess the intelligence and capacity to appreciate the consequences of their decision. Finally, the defendant must comprehend the charges and proceedings, punishments, and the facts necessary for a broad understanding of the case. These three things need not be established in a single colloquy.

1

3.

The decision to appoint standby counsel rests within the discretion of the district court.

4.

Once a defendant has validly exercised their right to self-represent, they do not have an absolute right to reverse course mid-trial and have counsel appointed to represent them. A district court's decision on a self-represented defendant's midtrial request for appointed counsel is discretionary. When faced with such a request, district courts should balance the reason for the request and alleged prejudice to the defendant if the request is denied with any disruption of the proceedings, inconvenience, delay, and possible confusion of the jury.

5.

When considering challenges to the sufficiency of the evidence, appellate courts do not assess witness credibility or reweigh evidence.

Appeal from Sedgwick District Court; JEFFREY E. GOERING, judge. Oral argument held May 8, 2024. Opinion filed July 26, 2024. Affirmed.

*Hope E. Faflick*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Lance J. Gillett*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

WILSON, J.: Christopher D. Kemmerly directly appeals his convictions for first-degree felony murder, theft, arson, and criminal possession of a firearm. He claims the district court violated his right to counsel, that his conviction was not supported by sufficient evidence, and that K.S.A. 21-6304(a)(3)(A) is unconstitutional. Finding no error, we affirm.

FACTS AND PROCEDURAL HISTORY

On the evening of February 17, 2019, Justin Gaston got out of a white Cadillac in the parking lot of a motel in Wichita. One of the Cadillac's occupants shot him in the back with a shotgun; he died shortly after the Cadillac sped off. Circumstantial evidence (including messages taken from Kemmerly's phone) eventually led investigators to arrest Kemmerly for Gaston's murder; statements by Reyna Wallace (Kemmerly's girlfriend and the Cadillac's driver) and Christopher Breedlove (the then-boyfriend of Kemmerly's sister) also implicated Kemmerly.

The State ultimately charged Kemmerly with felony murder, criminal possession of a weapon under K.S.A. 21-6304(a)(2), theft, and arson. The case went to trial, with two attorneys representing Kemmerly. After a five-day trial, a jury found Kemmerly guilty. Kemmerly then moved pro se for a new trial on a theory of ineffective assistance of counsel. After an evidentiary hearing, the district court granted Kemmerly's motion.

As discussed below, Kemmerly moved to represent himself at the second jury trial, which the district court granted. The second trial lasted nine days. Kemmerly represented himself throughout, calling numerous witnesses—including testifying

3

himself—and presenting dozens of exhibits. His theory, broadly, was that Wallace and another man known as "Scooby Dooby Doo" or "Scoob" had killed Gaston, and that any text or Facebook messaging implicating Kemmerly was, in fact, the product of Wallace having stolen his phone.

At the end of the second trial, the jury again found Kemmerly guilty of first-degree murder, criminal possession of a weapon by a convicted felon, theft, and arson. Judge Goering—who presided over almost every hearing, including both jury trials and all relevant motion hearings—gave Kemmerly a controlling sentence of 620 months. Kemmerly appealed.

ANALYSIS

*The district court did not violate Kemmerly's Sixth Amendment right to counsel.*

Kemmerly claims the district court violated his Sixth Amendment right to counsel twice:  first by allowing him to go to trial pro se without an adequate waiver, and later by denying him counsel when he requested it in the middle of his second trial.

Kemmerly also briefly mentions section 10 of the Kansas Constitution Bill of Rights but appears to treat it as indistinguishable from the Sixth Amendment. As in *State v. Couch,* 317 Kan. 566, 576, 533 P.3d 630 (2023), Kemmerly relies on Sixth Amendment caselaw and "does not use our established rules of constitutional interpretation to analyze whether the textual differences between section 10 and the Sixth Amendment are legally significant." *Couch*, 317 Kan. at 576. Thus, we treat Kemmerly's claim for relief as solely arising under the Sixth Amendment, as *Couch* did.

4

A. *Kemmerly's pretrial decision to self-represent did not violate his Sixth Amendment right to counsel.*

*Standard of Review*

"Waiver of the right to counsel must be knowingly and intelligently made and the determination of such a waiver depends on the particular facts and circumstances of each case." *State v. Buckland*, 245 Kan. 132, 137, 777 P.2d 745 (1989). Thus, to the extent the district court made findings in accepting Kemmerly's waiver, the court applies "a bifurcated standard of review, reviewing the district court's fact-findings for substantial competent evidence and the district court's legal conclusion de novo." *Couch*, 317 Kan. at 575. "Substantial competent evidence is that which possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved." *State v. Sharp*, 289 Kan. 72, 88, 210 P.3d 590 (2009).

*Additional Facts*

After his first trial, Kemmerly moved to represent himself on his pro se ineffective assistance of counsel motion. The district court heard the motion on February 6, 2020, and held an extended colloquy with Kemmerly, even commenting at one point that it would "read [the factors from *State v. Lowe*, 18 Kan. App. 2d 72, 76-77, 847 P.2d 1334 (1993)] straight from the case." Kemmerly acknowledged his understanding throughout. At the end of the discussion, the court found that Kemmerly "made a knowing and intelligent decision to forego counsel and to represent himself in this case," and permitted Mark Sevart to act as standby counsel. (During oral argument before this court, Kemmerly's counsel conceded this waiver was adequate.) But Kemmerly quickly backtracked and asked for counsel again, and the court reappointed Sevart. Sevart then

5

represented Kemmerly at the evidentiary hearing on the ineffective assistance of counsel motion, after which the court granted Kemmerly's motion and reversed Kemmerly's convictions.

On July 8, 2021, Kemmerly filed a motion for self-representation in his then-pending trial. In the motion, Kemmerly asserted:

"1.) He has a right to represent himself.

"2.) He is mentally competent.

"3.) He has displayed an understanding of the law.

"4.) He wishes to keep attorney Mr. Mark Sevart as an advisor or as stand-by in case he wishes to continue with court-appointed representation in the future. This is a reasonable request and not entirely uncommon."

On July 13, 2021, Kemmerly wrote to Judge Goering, stating, among other things: "Your Honor, I will be moving Pro Se. I will not be dissuaded from exercising that right. I don't need to have a Lowe Hearing. I will be formally waiving that. We need not to waste record space."

The district court heard Kemmerly's motion to self-represent on July 26, 2021. Sevart represented Kemmerly at first. The court noted that "this isn't the first *Lowe* hearing that we've had" and that "[w]e've gone through these elements before in a prior hearing." Kemmerly recalled the date almost correctly—"February 5th. You're right."— and agreed that judges in other cases had reviewed the *Lowe* factors with him before. The district court said that it did not "see any need to repeat what's already been mentioned to you on numerous occasions." But the court still clarified a few matters:

6

"THE COURT: . . . There are two factors though that I want to review with you so that we're sort of on the same page right out of the gate. The first is if I grant your motion for self-representation, you are basically in charge of the case and, you know, it's up to you to figure out how to do the things the lawyers would typically do.

"Do you understand that?

"THE DEFENDANT: Yep.

"THE COURT: All right. So one of the things we've been talking about briefly, there's this motion for a private investigator. I think you should understand that my role in that is to approve of a private investigator.

"Once you get Court approval of a private investigator, then it's up to the lawyer to contact the Board of Indigents' Defense Services to convince them that one is necessary to your case. And then it's up to you to convince the Board of Indigents' Defense Services that the person that you're proposing to do the investigation is somebody that they would approve of.

"All of that stuff is usually done by the lawyers. So it would have to be done by you at this time if your request is granted. In other words, I don't appoint investigators in the same way that I appoint lawyers. I just approve them.

"So if they're approved, then I know you don't want Ms. Morss on your case, and that's fine. It's just a matter of it will be up to you to locate somebody that can do that and can do it with approval of BIDS, and I know that's an important request to you, and I just wanted everyone to be up front as to what that's going to mean if I grant your request.

"THE DEFENDANT: Okay.

"THE COURT: Do you have any questions about that?

7

"THE DEFENDANT:  I just need that address.

"THE COURT:  All right. The address for BIDS?

"THE DEFENDANT:  Yeah.

. . . .

"THE COURT: . . . The second issue that I think that I need to review with you is that as an in-custody, you found that it is harder for you to represent yourself than it is when you're out of custody for the simple fact that your freedom is limited, your ability to communicate is limited. So the ability to issue subpoenas, to interview witnesses, to do those sorts of things is substantially harder for you as somebody in custody than it is for somebody out of custody.

"Do you understand that if I grant your motion to represent yourself that, you know, those are things that you're just going to have to figure out as an inmate of the Sedgwick County Jail?

"THE DEFENDANT:  Correct."

The court also discussed discovery logistics with Kemmerly and Sevart, who relayed that it amounted to "several thousand" pages and included photographs and videos. The court further pointed out that trial was scheduled in just eight weeks; although Kemmerly said he would be ready for trial by then, the court characterized this as "a very aggressive, optimistic view." At the end of this discussion the district court said that:

"The purpose of going through the *State v. Lowe* factors is so that you're well educated and know enough about the pitfalls of self-representation to make voluntary and

8

knowledgable [*sic*] decisions. So we've already been through that in this case before. You have been through it with other judges."

The court gave Kemmerly the chance to ask any questions; he did not. The court then granted Kemmerly's motion. Kemmerly remained pro se throughout the trial, although—as discussed below—he briefly requested counsel midway through trial. He also requested appointed counsel once the jury found him guilty, which the district court granted.

*Analysis*

"Neither the United States nor Kansas Constitutions explicitly provide for a right of self-representation. Instead, the United States Supreme Court implied the right to waive counsel and act as one's own attorney from the right to counsel granted in the Sixth Amendment to the United States Constitution." *State v. Burden*, 311 Kan. 859, 863, 467 P.3d 495 (2020). But "[b]ecause the right to represent oneself is 'at odds with the right to be represented by counsel, the courts must indulge every reasonable presumption against waiver of the right to counsel[ ] and will not presume acquiescence in the loss of fundamental rights, i.e., the right to counsel.'" *Burden*, 311 Kan. at 863. Thus, "in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits [associated with the right to counsel]." *Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

"A defendant who clearly and unequivocally expresses a wish to proceed pro se has the right to represent himself or herself after a knowing and intelligent waiver of his or her right to counsel. A knowing and intelligent waiver requires that the defendant be informed of 'the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.' The right to represent oneself is implicit in the structure of the Sixth Amendment. 'The right

9

to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.' A trial court may not measure a defendant's competence to waive his or her right to counsel by evaluating the defendant's 'technical legal knowledge.' [Citations omitted.]" *State v. Jones*, 290 Kan. 373, 376-77, 228 P.3d 394 (2010).

Some cases have "suggest[ed] the [district] court explain" certain consequences of the decision to proceed pro se. *Burden*, 311 Kan. at 864. But we do not require district courts to follow a particular checklist to ensure that a defendant's waiver of the right to counsel is knowing and intelligent; rather, we assess the sufficiency of a waiver of the right to counsel "by examining the circumstances of each case." *Burden*, 311 Kan. at 864. While such checklists certainly exist—including the so-called "*Lowe* factors" made famous by *State v. Lowe*, 18 Kan. App. 2d 72, 76-77, 847 P.2d 1334 (1993), which Kemmerly mentioned in his pretrial motion to proceed pro se—we have instead "suggested a three-step framework . . . to use in determining if a waiver is knowing and intelligent." *Burden*, 311 Kan. at 863. Under this framework:

"First, a court should advise the defendant of the right to counsel and to appointed counsel if indigent. Second, the defendant must possess the intelligence and capacity to appreciate the consequences of his or her decision. And third, the defendant must comprehend the charges and proceedings, punishments, and the facts necessary for a broad understanding of the case." *Burden*, 311 Kan. at 863.

Kemmerly's arguments focus on the third component of the *Burden* framework. He complains that the district court provided insufficient warnings about what Kemmerly was giving up and what would be expected of him and failed to inquire about Kemmerly's state of mind.

But the law does not require us to wear blinders, ignoring everything *but* that colloquy. Instead, we "weigh whether a defendant has knowingly and intelligently

10

waived the right to counsel by examining the circumstances of each case." *Burden*, 311 Kan. at 864. Cf. *State v. Armstrong*, 240 Kan. 446, 454, 731 P.2d 249 (1987) (looking to defendant's knowledge of the charges, penalties, and defenses from his previous two trials, at which he was represented by counsel). See also, e.g., *United States v. Forrester*, 512 F.3d 500, 506-07 (9th Cir. 2008) (noting a "'limited exception'" when a district court's colloquy is insufficient but "'the record as a whole reveals a knowing and intelligent waiver'"); *United States v. Todd*, 424 F.3d 525, 531-33 (7th Cir. 2005) (failure to conduct a "full" *Faretta* inquiry "is not necessarily fatal"; analyzing full record of the case to consider whether defendant made a knowing and intelligent waiver); *United States v. Singleton*, 107 F.3d 1091, 1097 (4th Cir. 1997) ("[W]e review the sufficiency of a waiver of the right to counsel by evaluating the complete profile of the defendant and the circumstances of his decision as known to the trial court at the time. This determination can be made by examining the record as a whole."); *United States v. Willie*, 941 F.2d 1384, 1389 (10th Cir. 1991) ("[T]he surrounding facts and circumstances, including [defendant's] background and conduct, demonstrate that [defendant] actually understood his right to counsel and the difficulties of pro se representation and knowingly and intelligently waived his right to counsel.").

Thus, we consider the whole record to gauge whether the district court had sufficient information to find that Kemmerly's waiver and decision to self-represent was knowing and intelligent. As noted, Judge Goering presided over almost all the hearings in the record—including both trials and both hearings on Kemmerly's motions to go pro se. He had ample opportunity to observe Kemmerly and, thus, to conclude that Kemmerly knew of his right to counsel, understood the nature of the charges and punishment, and possessed the intelligence and capacity to understand the consequences of the waiver. Further, Judge Goering knew that he had explained the consequences of a waiver both at the first waiver colloquy and—to a lesser degree, albeit with more specific trial-focus—at

11

the second waiver colloquy 17 months later. And while Kemmerly complains that the district court took no steps at the second colloquy to ensure that Kemmerly *remembered* the first colloquy, Kemmerly's agreement that they covered the material before—in addition to his ability to recall *Lowe* by name and even, within a day, the date of the first colloquy—support the finding that Kemmerly knew those things *Burden* requires and had the intelligence and capacity to understand them.

Thus, despite the district court conducting an abbreviated colloquy immediately before accepting Kemmerly's waiver of his right to counsel, the record convinces us that the district court did not err in finding Kemmerly's waiver of his right to counsel and his decision to self-represent were knowing and intelligent under the three *Burden* requirements. We again emphasize that the district court need not go through a *Lowe* style checklist before accepting a waiver of the right to counsel—however advisable such a checklist may be to clearly document, on the record, that the defendant waived his rights knowingly and intelligently—so long as the requirements outlined in *Burden* have been satisfied. Here, the district court did not violate Kemmerly's rights in permitting him to proceed to trial pro se.

B. *The district court did not abuse its discretion in denying Kemmerly's midtrial request for counsel.*

Kemmerly next complains that the district court violated his right to counsel by denying his midtrial request for an attorney and by failing to appoint him standby counsel.

*Standard of Review*

Kemmerly's argument implicates the district court's discretion. "'A district court abuses its discretion when (1) no reasonable person would have taken the view adopted by the district court; (2) the judicial action is based on an error of law; or (3) the judicial action is based on an error of fact.'" *State v. Hillard*, 313 Kan. 830, 838, 491 P.3d 1223 (2021) (quoting *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 [2018]). The burden of establishing an abuse of discretion rests with the party alleging it. *Hillard*, 313 Kan. at 838.

*Additional Facts*

On the sixth day of trial and the fifth day of evidence, Kemmerly called his sister Heather to the stand. On redirect, Kemmerly tried to ask her about the quality of the questions she was asked during his first trial, but the district court blocked this line of questioning. After the district court sent the jury out for the afternoon recess, Kemmerly began to complain about his counsel from the first trial; the district court explained that the conduct of the attorneys during the first trial was "just simply not admissible." The district court recognized Kemmerly's point that his sister had testified consistently and allowed him to highlight whether "you were never asked" a question but forbade him from asking "whether a question was proper or not." The court then took a recess.

After the recess, the court asked if the parties wished to add anything. Kemmerly said, "Outside my request for counsel, nothing, Your Honor." He then clarified:

"Mr. Kemmerly: I said outside of a request for counsel since I'm, you know, getting stonewalled, nothing. Nothing else.

13

"The Court: Okay.

"Well, in terms of a request for counsel, I think it is a little late to appoint counsel, so—well, that request just isn't timely, so let's bring in the jury."

Kemmerly did not request counsel again until the end of his trial, when he asked for—and was given—counsel for post-trial matters and appeal.

*Analysis*

While there is some indication Kemmerly's midtrial request for counsel was more complaint than actual request, we assume for purposes of this analysis it was a genuine request. This court has not considered whether a district court's refusal to appoint midtrial counsel after a defendant's prior knowing and intelligent waiver of counsel rests in the district court's discretion. But we have held that a district court has discretion when faced with the inverse scenario: a represented defendant's midtrial request to proceed pro se. E.g., *State v. Collins*, 257 Kan. 408, 416, 893 P.2d 217 (1995); *State v. Cromwell*, 253 Kan. 495, 505, 856 P.2d 1299 (1993). When presented with such a request, district courts "should balance the alleged prejudice to the defendant with any disruption of the proceedings, inconvenience and delay, and possible confusion of the jury" and "should also consider the reason for the request and the quality of counsel's representation." *Collins*, 257 Kan. at 415. We now extend this reasoning to situations like Kemmerly's: a pro se defendant who requests counsel midtrial. See, e.g., *State v. Hubbard*, No. 121,757, 2021 WL 137398, at *7-9 (Kan. App. 2021) (unpublished opinion); *State v. Campbell*, No. 116,551, 2018 WL 1352541, at *5-8 (Kan. App. 2018) (unpublished opinion). See also *United States v. Leveto*, 540 F.3d 200, 207 (3d Cir. 2008) ("[O]nce the [Sixth Amendment] right [to counsel] has been properly waived, as is the case here, we are persuaded by the broad consensus of other courts that the consideration of a defendant's

14

post-waiver request for counsel is well within the discretion of the district court."). Thus, we must assess whether the district court abused its discretion.

Kemmerly's request for counsel arose almost as an aside following his unsuccessful attempt to question his sister about his counsel's questioning during his *first* trial. It appears his only reason for seeking appointed counsel was his belief that he was being "stonewalled" on this line of questioning.

Kemmerly suggests, without elaboration, that "the court could have avoided disruption by appointing standby counsel." But the decision to appoint "standby" counsel or authorize some other hybrid representation scheme is discretionary. E.g., *Buckland*, 245 Kan. at 139; *State v. Matzke*, 236 Kan. 833, 837, 696 P.2d 396 (1985); *Hubbard*, 2021 WL 137398, at *4-6. And appointed counsel in any capacity, standby or otherwise, would have had to come up to speed on the case before they could effectively represent Kemmerly—a delay that would have taken weeks, at a minimum, and caused inordinate disruption. Moreover, the appointment of counsel would not have addressed the object of Kemmerly's vexation: the district court would not have permitted appointed counsel to question the propriety of Kemmerly's first attorney's questioning any more than it allowed Kemmerly to do so.

Kemmerly fails to show that the district court's decision not to appoint counsel was based on an error of fact or law, much less that no reasonable person would have made the same choice—especially when nobody raised the matter of standby counsel at the hearing, even though the motion itself requested standby counsel. Thus, we find no error in the district court's refusal to appoint Kemmerly counsel midtrial.

*Sufficient evidence supported Kemmerly's convictions.*

Kemmerly next argues that his felony murder conviction was not supported by sufficient evidence because Wallace—whom he calls the State's "star" witness—suffered from such a lack of credibility that no rational fact-finder could have found Kemmerly guilty. Although Kemmerly acknowledges the general rule that appellate courts do not reweigh evidence or pass on credibility, he argues that "[a] witness can be so incredible that i[t] does not sustain a conviction when no rational factfinder could believe the testimony and find a defendant guilty beyond a reasonable doubt."

> "'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. This court has also recognized that there is no distinction between direct and circumstantial evidence in terms of probative value.'" *Hillard*, 313 Kan. at 848 (quoting *State v. Colson*, 312 Kan. 739, 749-50, 480 P.3d 167 [2021]).

Kemmerly relies on *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983), to support this extraordinary claim. Unlike the present case, *State v. Matlock* involved a conviction for rape based solely on the uncorroborated testimony of the complaining witness. 233 Kan. at 3. The court emphasized an apparently special rule that "in order to convict on the uncorroborated testimony of the prosecutrix, the testimony of the prosecutrix must be clear and convincing, and that where her testimony is so incredible and improbable as to defy belief, the evidence is not sufficient to sustain a conviction." 233 Kan. at 3. After "carefully examin[ing]" the myriad ways in which the defense witnesses undercut the testimony of the complaining witness, the court concluded that

16

she was unbelievable and, thus, that insufficient evidence existed to support a conviction. 233 Kan. at 4-6.

*Matlock* provides Kemmerly no help. Even if *Matlock* were not so clearly distinguishable—a rape case with apparently no corroborating evidence to support a certain witness' claim—no other Kansas case has followed its "aberrant review." See *State v. Brinklow*, 288 Kan. 39, 53, 200 P.3d 1225 (2009) (*Matlock* "is perhaps the only case of its kind in this state where the Supreme Court directly weighed the evidence and assessed the credibility of the prosecutrix to reverse a conviction for rape."). Considering the mountain of precedent forbidding us to consider witness credibility as a component of a sufficiency of the evidence analysis, we see no reason to entertain *Matlock*.

If the jury disregarded Wallace's testimony, a wealth of circumstantial evidence admitted at trial supports the jury's finding beyond a reasonable doubt that Kemmerly shot and killed Gaston. Viewing that evidence in a light most favorable to the State, Kemmerly's claim fails.

*Kemmerly failed to preserve his claim that K.S.A. 21-6304(a)(3)(A) violates section 4 of the Kansas Constitution Bill of Rights, and we decline to review it.*

Finally, Kemmerly argues that K.S.A. 21-6304(a)(3)(A) is unconstitutional under section 4 of the Kansas Constitution Bill of Rights. Ignoring that he was actually convicted under K.S.A. 21-6304(a)(2), Kemmerly failed to raise this challenge before the district court. He argues that the court should address the issue for the first time on appeal anyway because—he claims—it poses a pure question of law, involves the "fundamental" right to bear arms, and is necessary to serve the ends of justice. He also highlights the "at

17

least ten panels of the Court of Appeals" that have been presented with this issue but declined to reach the merits.

"Without a contemporaneous objection, constitutional issues cannot generally be raised for the first time on appeal. We have recognized some exceptions to this general rule, including situations where consideration of an issue is necessary to protect fundamental rights. But '[t]he decision to review an unpreserved claim under an exception is a prudential one' and '[e]ven if an exception would support a decision to review a new claim, we have no obligation to do so.' [Citations omitted.]" *Hillard*, 313 Kan. at 839-40.

The "prudential" exceptions to the general preservation rule arise when "'(1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is determinative; (2) consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the trial court may be affirmed because it was right for the wrong reason.'" *In the Interest of N.E.*, 316 Kan. 391, 408, 516 P.3d 586 (2022) (quoting *State v. Perkins*, 310 Kan. 764, 768, 449 P.3d 756 [2019]).

Kemmerly claims the first two exceptions apply. But we disagree that his theory involves *only* a question of law. E.g., *Hodes & Nauser, MDs, P.A. v. Schmidt*, 309 Kan. 610, 669, 440 P.3d 461 (2019) (highlighting the parties' burdens within the constitutional challenge framework). As observed by some of the panels that have rejected the application of prudential exceptions to arguments like Kemmerly's, constitutional questions "often involve considerable factual development"—development which is also absent here. *State v. Foster*, 60 Kan. App. 2d 243, 255, 493 P.3d 283 (2021) (quoting *State v. Johnson*, No. 121,187, 2020 WL 5587083, at *5 [Kan. App. 2020] [unpublished opinion]). And while Kemmerly simply claims that section 4 always prohibits any

18

restriction on the possession of firearms, the State—the party to whom the burden would shift if strict scrutiny were applied—has had no opportunity to develop a factual record "to establish the requisite compelling interest and narrow tailoring of the law to serve it." *Hodes,* 309 Kan. at 669.

Even assuming without deciding that the rights codified by section 4 are fundamental, we decline to extend a prudential exception to Kemmerly's claim. As noted, the absence of any factual development hampers our ability to consider several critical points necessary for the resolution of Kemmerly's constitutional challenge. Thus, we will not reach Kemmerly's challenge for the first time on appeal.

CONCLUSION

We affirm Kemmerly's convictions and sentence.

19